# EXHIBIT "1"

# IN THE CIRCUIT COURT FOR BARBOUR COUNTY, EUFAULA DIVISION

**BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY**

    **Plaintiff**

    **vs.**

**JACK J. RUSCH,**

**and FICTITIOUS PARTIES "A", "B", "C", "D", "E", "F", "G", "H", "I", "J", "K", & "L"**

    **Defendants**

}
}
}
}
}
}
}
}
}
}
}
}
}
}
}

CASE NO. CV-2005-93



---

# COMPLAINT

---

**COMES NOW** Plaintiff, the BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY, and files this its Complaint against the Defendant as follows:

## PARTIES

1.    Plaintiff, the BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY, (hereafter "the Authority") is a public corporation created under the authority of Ala.Code 1975 § 41-10-149.

2.    Defendant, JACK J. RUSCH, is an adult resident citizen of Eufaula, Barbour County, Alabama.

3..    The Defendants Fictitious Parties "A", "B", "C" "D", "E", "F", "G", "H", "I", "J", "K", and "L" are those individuals or entities, whether singular or plural, who are involved with the defendant in the operation or leasing of property owned by the Authority, and/or are individuals or entities, whether singular or plural, who claim any interest in or to the property which is the subject of this action. Plaintiff avers that the identities of these Fictitious Parties are otherwise unknown to the Plaintiffs at this time, but their true names will be substituted by amendment when ascertained.

## FACTS

4.    Plaintiff realleges all prior paragraphs of the Complaint as if set out here in full.

5.    In 1979, the Legislature of the State of Alabama enacted the Historical Preservation Authorities Act of 1979, which became effective on July 19, 1979. (Acts 1979, No. 79-441, p. 710, § 1, et seq., codified as Ala.Code 1975 §§ 41-10-135 et seq.).

6.    Pursuant to said Act, Charles L. Rogers, Lynne M. MacElvain and Louella Hobbs filed an application with the Honorable George C. Wallace, Governor of the State of Alabama, seeking to form the Authority.

7.    By Executive Order Number 29, dated June 6, 1984, the said George C. Wallace, Governor of the State of Alabama, authorized formation of the Authority. (Exhibit A).

8.    Rogers, MacElvain and Hobbs, as Incorporators, filed the Certificate of Incorporation of the Barbour County Historical Preservation Authority dated March 28, 1984 with the Secretary of State of Alabama, (Exhibit B) and the Authority was incorporated on June 8, 1984.

9.    On June 11, 1984, Louella Hobbs, Lynn M. MacElvain and Charles L. Rogers were elected as directors of the Authority by the County Commission of Barbour County, Alabama. (Exhibit

2

C).

10.    On June 25, 1984, the Authority held its first meeting where a Seal was authorized and Bylaws adopted. (Exhibit D).

11.    At that same meeting, by unanimous vote, the Authority authorized execution of an "Inducement Agreement" between the Authority and Jack J. Rusch (Exhibit D).

12.    The "Inducement Agreement" was executed by the Authority on June 25, 1984; by Rusch (referred to in the Agreement as "the Company") on June 29, 1984; and deemed by its terms to have been delivered on June 29, 1984.  (Exhibit E, p. 14).

13.    The Inducement Agreement was issued to "induce" the Company (Rusch) to locate its hotel in Eufaula and thereby promote the preservation of and interest in property listed in the National Register of Historic places, including the "Site," which was defined as

> The Bluff City Inn property at the northwest corner of Broad Street and Eufaula Avenue and property along the east side of Eufaula Avenue known as the Spurlock Warehouse property.

*id.*, p. 15.

14.    The Inducement Agreement was primarily concerned with issuing Bonds to provide funding to acquire, restore and renovate the Site, but also provided that prior to issuing such Bonds, temporary funding for such purposes could be made available through "Bond Anticipation Notes." (*id.*, Section 1, p. 1-2.)

15.    To secure payment of the Bond Anticipation Notes, the Authority and Rusch agreed to enter into a loan agreement with the lender of the funds evidenced by the notes, in which they wold all agree that "either":

3

(1)     Rusch would execute a lease which would allow the Authority to issue Bonds in an amount sufficient to pay any such Notes,

(2)     "or," if no Bonds were issued, Rusch would pay the Authority the amounts necessary to pay any Bond Anticipation Notes which had been executed.

(*id.*, Section 1, p. 2; see also Section 5, p. 3).

16.     Section 5 of the Agreement specified provisions which the parties agreed would be in the lease in the event a lease was executed "[i]n connection with the issuance of the Bonds." If the Bonds were issued, the Authority and Rusch agreed: (a) to enter into a lease; (b) for a term extending until the final maturity of the Bonds, providing sufficient rent to retire the Bonds; and (c) giving Rusch an option to purchase the property at any time after the Bonds and Bond Anticipation Notes were paid for a purchase price not to exceed one thousand dollars ($1000.00). (*id.*, Section 5, p. 3-4). Of course, no Bonds were issued, therefore, no lease entered into between the parties "in connection with the issuance of the Bonds." Even though there was a lease, it was not entered into "in connection with the issuance of the Bonds" or pursuant to the Inducement Agreement because  (a) the Inducement Agreement terminated by its own terms when no Bonds were issued (see below); and (b) by the fact that the terms of the Lease differed from the terms agreed to in the Inducement Agreement, i.e., the terms of the option to purchase were different.  (see ¶ 27, below).

17.     The Inducement Agreement provided that if the Bonds authorized by the agreement were not issued by July 1, 1985, the agreement would terminate, and further provided that in the event of termination, "the Authority will covey to the Company all property and interest in property (whether real, personal or mixed) constituting part of the Project to which the Authority has theretofore acquired title . . . ." (*id.*, Section 12, p. 11).

4

18.     The Inducement Agreement appointed Rusch "its general agent" and authorized him to take all actions necessary "to accomplish the Project Work" including buying materials, issuing contracts for work and the like. (*id.*, Section 7, p. 4-5).

19.     The Inducement Agreement allowed the agent to purchase all materials, equipment, furnishings and supplies in the name of the Authority, and to do so, pursuant to Historical Preservation Authorities Act, free of all state and local sales tax. (*id.*, Section 8, p. 6).

20.     The Act also provided that the property and income of the Authority was exempt from all taxation in the state, including property taxes, licenses, excise taxes and recording fees. (Ala.Code 1975 § 41-10-147).

21.     On February 22, 1985, J. Gorman Houston, Jr. and wife Mauthur M. Houston, Celeste Houston, Billy V. Houston and wife Marie D. Houston conveyed property which included the "Bluff City Inn Hotel" and the building on the west side of the Hotel, all in Eufaula, Barbour County, Alabama, to the Authority by the Warranty Deed which was recorded on February 26, 1985 (Exhibit F).

22.     On February 25, 1985, Jack J. Rusch executed an "Absolute Guaranty of Payment of Obligation" wherein Rusch guaranteed payment of the note issued by the Authority to J. Gorman Houston, Celeste Houston and Billy V. Houston in the principal amount of $80,000, payable in monthly installments of $1,057.21 for ten years. This Guaranty was recorded on February 26, 1985. (Exhibit G).

23.     On February 25, 1985, the Authority leased the property described in the Houston Deed to Jack J. Rusch. The lease was recorded on February 26, 1985. (Exhibit H).

24.     Rent was set at $1,057.21 per month for 120 months of the term and $100.00 per month

5

for the remaining 60 months, with an option to renew the lease for an additional fifteen years at a monthly rental of one hundred dollars ($100.00) a month. (*id.*, p. 1). The rents were to be paid to the credit of the Authority by depositing such rent into checking account number 780 31664 in the "Central Bank of the South" (now Compass? Bank). (*id.*, ¶7, p. 4). Upon information and belief, plaintiff avers that no such account number exists at said bank, that no account in the name of the Authority exists at said bank, and that no records of such an account ever existing can be found. Upon information and belief, the Authority would show that it has received no rental payments at all.

25.    The option to renew the lease for an additional fifteen years required "written notice to the authority of his intention to exercise this option." (*id.*) No written notice has been received by the Authority, and the lease expired by its own terms on February 25, 2000.

26.    In the Lease, Rusch covenanted to "take good care of said premises and to keep the same in as good repair and condition as the same are in at the commencement of the term of this lease . . . ." (*id.*, ¶1, p. 2). The members of the Authority have carefully and personally inspected the Bluff City Inn and have found that Rusch has failed to keep the premises in good repair. In fact, Rusch has allowed it to deteriorate, rot and fall into disrepair. Not only has the Hotel and surrounding property become an eyesore and embarrassment to the city of Eufaula, but it has been allowed to deteriorate to the point where it may be beyond repair, and any repairs, if possible, will now be much more extensive and costly than they would have been had the premises been kept in good repair as required by the lease. In many respects, the Hotel in its present condition constitutes a danger to the general public. The value of the premises has been diminished because Rusch has failed to keep it in repair and allowed it to fall into such deplorable condition. This action or lack of action, constitutes a material breach of the lease agreement.

27.    The Lease provided that if Rusch paid the rent, he would be given an option to purchase the property for an amount "sufficient to pay, retire and redeem all outstanding bonds" issued by the Authority, "namely, Eighty Thousand Dollars ($80,000.00) plus accrued interest of ten per cent (10%) per annum on the unpaid balance," plus any sums paid by the Authority, plus fees for the transfer plus one hundred dollars ($100.00.). In the event the Bonds were paid in full at the time the option was exercised, Rusch could purchase the property from the Authority for one hundred dollars ($100.00). The option was to be exercised by written notice, not less than thirty days prior to the date of the purchase. (id., ¶11. p. 5). No Bonds have been issued and this option has never been exercised.

28    No Bonds were issued by the Authority prior to July 1, 1985.

29.    On August 1, 1985, W. Young Johnston, Robert D. Powers, Kendall C. Powers and William H. Clark conveyed to the Authority other property bounded by the property "formerly of the J. L. Houston Estate." (Exhibit I).

30.    On September 28, 1985, J. Gorman Houston, Jr., as Trustee for the Jack J. Rusch Trust, conveyed to the Authority a brick warehouse on the east side of Eufaula Street by warranty deed which was recorded on October 2, 1985. (Exhibit J).

31.    On October 11, 1985, at a special meeting of the Board of Directors of the Barbour County Historical Preservation Authority, the Board approved an amendment to the Inducement agreement which changed the termination date from July 1, 1985 to October 1, 1986, "said amendment to be effective as of July 1, 1985," and further authorized the officers of the Board to execute said amendment. (Exhibit K).

32.    An amendment to the Inducement Agreement was executed by the Chairman and Secretary of the Board. This amendment was entitled:

7

AMENDMENT NO. 1
TO INDUCEMENT AGREEMENT BETWEEN
BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY
AND JACK J. RUSCH
**DATED AS OF JUNE 25, 1984**

(Exhibit L, bold added)

33.    The Amendment also stated that it was effective as of July 1, 1985. (*id.*,).

34.    No Bonds were issued by the Authority before October 1, 1986, and, in fact, no Bonds have been issued to this date.

35.    Because no Bonds were issued by July, 1985, the Inducement agreement terminated pursuant to the provisions of Section 12 thereof. In October, 1985, the Authority attempted to breathe new life into the terminated Inducement Agreement by back dating an extension to the Inducement agreement by dating it July, 1984 and stating in it that it was effective as of July, 1985. Even if this attempt to revive the Inducement Agreement was successful, no Bonds were issued by October, 1986, and therefore, even if the extension was valid, the Inducement Agreement terminated in October, 1986, pursuant to Section twelve thereof.

36.    On April 18, 2005, over twenty (20) years after its execution and delivery, and nearly twenty years after it terminated , the Inducement Agreement was recorded amongst the land records of Barbour County, Alabama, in Book E275 at page 45. (Exhibit E., p. l).

37.    Despite the fact that the Inducement Agreement terminated at least by October, 1986, Rusch has held himself out to be the agent of the authority, and continues to do so even though his only authority to act as general agent was contained in the Inducement Agreement.

38.    Because the Inducement was not recorded, the public was not aware and could not have been aware that the Inducement Agreement terminated at least by October, 1986, and that Rusch had

8

no authority to act as agent for the Authority.

39.     Since 1984, Rusch has paid no property tax on any of the buildings owned by the Authority and operated by him. It is estimated that the amount of property tax which was not paid exceeds $50,000.00.

40.     Since 1984, Rusch, holding himself out as general agent of the Authority under the terminated Inducement Agreement, has opened business accounts in the name of the Authority and has purchased and continues to purchase equipment and materials in the name of Authority, all free of state and local sales tax.

41.     Since February 25, 1985, the date of the lease, Jack J. Rusch has sublet the property and collected rents from such sub-lessees, and continues to do so.

42.     Upon information and belief, plaintiff would show that while holding himself out as the general agent for the Authority under the expired Inducement Agreement, Rusch removed from the Hotel and sold various items of equipment and fixtures of historic interest and value, including claw-footed bathtubs, lighting fixtures and hardware, collecting the proceeds from same for his own use and benefit.

43.     Since this controversy has become public, Rusch has tendered a check for $1000.00 to the Authority, seeking to purchase the property under the purchase provisions of Section 5 of the Inducement Agreement.

## COUNT ONE: DECLARATORY JUDGEMENT

44.     Plaintiff realleges all prior paragraphs of the Complaint as if set out here in full.

45.     The above facts show that there is bona fide justiciable controversy existing between

9

the Plaintiff and the defendant.

46.     Rusch continues to hold over after termination of the Inducement Agreement and termination of the lease; continues to collect rents; and unlawfully holds himself out as the agent of the Authority to those having dealings with him and/or the property of the Authority.

47.     There is substantial doubt and uncertainty about the validity and application of the various documents executed by and between the parties over the years and the resulting status of the parties and the property under the various contracts, deeds and leases.

## COUNT TWO: QUIET TITLE/ADVERSE POSSESSION

48.     Plaintiff realleges all prior paragraphs of the Complaint as if set out here in full.

49.     This count is brought pursuant to the Code of Alabama, 1975, § 6-6-540 et seq.

50.     Plaintiff is and has been since 1985, in the actual, peaceable, notorious, and adverse possession of the following described property, claiming to own the same, being the same property described in Exhibits F, I and J attached hereto, and that Plaintiff and his predecessors in title have held and hold color of title to the said lands, being the fee simple interest therein so claimed, for a period of ten or more consecutive years next preceding the filing of this complaint, and, no ad valorem taxes be due thereon during Plaintiff's period of ownership, pursuant to Ala.Code 1975 § 41-10-147,

51.     That the Defendants herein are the lands herein described, and Jack J. Rusch, Lessee, and any and all persons claiming any present, future, contingent, reversionary, remainder, or other interest in and to said property. Plaintiff is not aware of any persons who make claims who are not individually named herein as Defendants, but in the event parties are made known, same will be joined herein.

10

52.     There are no other named Defendants hereto because the Plaintiff has made diligent inquiry and have not been able to ascertain any other person or persons making claim to or interest in the said lands.

53.     The Plaintiff holds color of title to the above described lands under and by virtue of the deeds from the Houston's, Johnston, et al., and the Jack J. Rusch Trust, respectively, attached hereto as Exhibits F, I and J, and referred to above.

54.     The Plaintiff does not know of any person who claims any interest in the above described lands or any part thereof, or lien thereon, or encumbrance thereon, except as alleged in this Complaint.

55.     There is no suit pending to test or determine the title to or any interest in, or right of possession of the Plaintiff in or to the said lands or any part thereof, and that no suit is pending to test or determine any other title to, interest in, or right of possession of the said lands or any part thereof.

56.     The Plaintiff has named as Defendants hereto all persons who are known to Plaintiffs who may claim any part or interest in said lands.


**WHEREFORE, PREMISES CONSIDERED:**

(a)     Plaintiff seeks and requests a judgement of this Court declaring the rights, status and relations between Plaintiff and Defendant under the various documents attached hereto;

(b)     Plaintiff seeks and requests a judgement of this Court declaring the rights, status and relations between Plaintiff and Defendant with respect to the real property held in the name of the Authority;

(c)     Plaintiff prays that this Court:

11

1.  declare that the Inducement Agreement terminated in July 1985, or in October, 1986;

2.  declare that when the Inducement Agreement terminated, all provisions under the Inducement Agreement including the buy-out provision and Rusch's authority to act as General Agent for the Authority under the Inducement Agreement terminated;

3.  declare that the actions taken by Rusch holding himself out to be the General Agent of the Authority are null and void;

4.  declare that the lease agreement terminated in 2000 because it was not renewed;

5.  declare that if renewed, the lease terminated for failure to pay rent;

6.  declare that if renewed and not otherwise terminated, Rusch breached the lease by failing "to take good care of the said premises and keep the same in as good repair and condition as the same" were in at the commencement of the lease causing the lease to terminate;

7.  declare that the Authority is the owner in fee simple of the property held by it under the deeds referred to hereinabove, free and clear of any encumbrance of the Inducement Agreement or the lease;

(d)     Plaintiff further prays that this Court find that under the facts of this case, any action by Rusch based on the Inducement Agreement is barred by the Statute of Limitations and/or by the equitable doctrine of Laches;

(e)     Plaintiff further prays that this Court appoint a guardian ad litem to represent all

unknown Defendants;

(f) Plaintiff further prays that the Court enter a judgement or decree that the Plaintiff have the entire and undivided fee simple interest in and to said lands with no restrictions thereon by virtue of its holding the property under color of title for more than ten (10) years;

(g) Plaintiff further prays that this Court require Rusch to render to the Authority an accounting of all financial transactions pertaining to the property since 1985;

(h) Plaintiff further prays that this Honorable Court ascertain the amount of compensatory and punitive damages, if any, necessary to fully compensate Plaintiff for any losses and adequate to reflect the severity and enormity of the damages caused by the Defendants' actions and inactions and will render a judgement against Defendant in such amount;

(i) Plaintiff further prays that said amount will include the costs of this proceeding and a reasonable sum in payment of Plaintiffs' attorney; and,

(j) Plaintiff further prays that this Court will grant to it such other further, additional or different relief as may be just and proper under the circumstances.

THE BARBOUR COUNTY HISTORICAL
PRESERVATION AUTHORITY

By: Walter B. Calton
Walter B. Calton (CAL036)
Attorney for the Authority

312 East Broad Street
P.O. Box 696
Eufaula, Ala. 36072

EXHIBIT A



## EXECUTIVE ORDER NUMBER 26

WHEREAS, Act No. 79-411 enacted at the 1979 Regular Session of the Alabama Legislature (Section 41-10-135 et seq., <u>Code of Alabama, 1975</u>, and herein referred to as the "Act") authorizes the formation of historical preservation authorities in the State of Alabama; and

WHEREAS, Charles L. Rogers, Lynne M. MacElvain and Louella Hobbs, pursuant to this Act, filed an application with me seeking permission to form the "Barbour County Historical Preservation Authority";

NOW, THEREFORE, I, George C. Wallace, Governor of the State of Alabama, do hereby certify and declare as follows:

1. I have reviewed the contents of the application and we found and determined that the statements of fact contained in the application are true.

2. The proposed activities of the proposed public corporation (to be known as the Barbour County Historical Preservation Authority) in the proposed area of operation prescribed in the application will promote the restoration, renovation, preservation, improvement, protection or maintenance and public interest in land, buildings, houses, or other structures, facilities or property located in the National Register of Historic Places and that, for such reason, it is wise, expedient and necessary that such public corporation be formed and the persons filing the

application are hereby authorized to proceed to form such public corporation.

DONE and ORDERED this 6th day of June, 1984.

George C. Wallace
Governor

ATTEST:

Secretary of State

FILED IN THIS OFFICE
1984
JUN - 8 1984
AL - 86-91

ALABAMA
HISTORICAL COMMISSION

CERTIFICATE OF INCORPORATION OF
BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY

APR 27 1984

RECEIVED

TO:   THE HONORABLE DON SIEGELMAN,
      SECRETARY OF STATE OF THE STATE OF ALABAMA:

PLAINTIFF'S
EXHIBIT
B

The undersigned Charles L. Rogers, Lynne M. MacElvain and Louella Hobbs, each of whom is a natural person over the age of twenty-one (21) years, is a resident of Barbour County, Alabama, and is a qualified elector of and taxpayer of Barbour County, Alabama, desiring to organize a public corporation under the laws of the State of Alabama, and particularly under "The Historical Preservation Authorities Act of 1979" (Act No. 79-441, adopted at the 1979 Regular Session of the Legislature of Alabama), and being all of the incorporators of said public corporation do hereby make, execute and file this Certificate of Incorporation, stating as follows:

1.   Incorporators.  The names of the persons incorporating the Authority and their respective post office addresses are as follows:

| Name | Address |
|---|---|
| Charles L. Rogers | Route 2, Box 41<br>Anderson Drive<br>Eufaula, Alabama 36027 |
| Lynne M. MacElvain | 725 North Randolph Avenue<br>Eufaula, Alabama 36027 |
| Louella Hobbs | P. O. Box 453<br>Midway Street<br>Clayton, Alabama 36016 |

Each of such persons is a qualified elector of Barbour County, Alabama.

2.   Name of Authority.  The name of the public corporation organized hereby is and shall be "BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY".

3.   Location of Principal Office.  The principal office of the Authority shall be located in Eufaula, Alabama, which is within the principal area of operation of the Authority.

4.   Area of Operation.  The area of operation of the Authority shall be within Barbour County, Alabama.

5.  Objects and Purposes of the Authority.  The objects and purposes of the Authority shall be as follows:

(a)  to undertake and to make or cause to be made engineering, architectural, technical, financial, legal and other appropriate studies and surveys with respect to restoring, renovating, preserving, improving, protecting or maintaining any public or private property within Barbour County, Alabama, that has been listed in the National Register of Historic Places, or providing vicinity improvements;

(b)  to restore, construct, acquire, own and operate singly or in conjunction with others, lease, sell, and otherwise dispose of land, buildings, houses, structures, facilities and property within Barbour County, Alabama, that have been listed in the National Register of Historic Places, and any vicinity improvements; and

(c)  to cooperate with and lend financial assistance and other aid to persons in any matters and undertakings having to do with or the end purpose of which is to restore, renovate, preserve, improve, protect or maintain any public or private property within Barbour County, Alabama, that has been listed in the National Register of Historic Places, or to provide vicinity improvements.

6.  Powers.  In furtherance of the purposes described herein, the public corporation organized hereby shall have all powers conferred on public corporations of like nature by The Historical Preservation Authorities Act of 1979 (Act No. 79-441, adopted at the 1979 Regular Session of the Legislature of Alabama), and any amendment thereof heretofore or hereafter made, and all other powers conferred upon corporations generally by the laws of the State of Alabama not in conflict with the provisions of the above-described Act, as heretofore or hereafter amended.

7.  Board of Directors.  The governing body of the public corporation organized hereby shall be a Board of Directors which shall consist of three members who shall be appointed in the manner and for the terms of office provided by the above-described Act, as heretofore or hereafter amended.

8.  Duration.  The period of duration of the public corporation organized hereby shall be perpetual.

9.   **Nonprofit Nature.**  The public corporation organized hereby shall be a nonprofit corporation, and no part of the net earnings thereof shall inure to any individual or private corporation.

10.   **Authority to Incorporate.**  Attached hereto is Exhibit "A", an executive order of the Governor of the State of Alabama, approving the application of the undersigned incorporators to organize the public corporation hereby organized and authorizing the incorporation of the Authority under the name "BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY".

IN WITNESS WHEREOF, the undersigned incorporators have hereunto subscribed their signatures this **28th** day of **March** _____, 1984.

_____
Charles L. Rogers

_____
Lynne M. MacElvain

_____
Louella Hobbs

STATE OF ALABAMA

COUNTY OF BARBOUR

I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that Charles L. Rogers, Lynne M. MacElvain and Louella Hobbs, whose names are signed to the foregoing Certificate of Incorporation and who are known to me, acknowledged before me on this day that, being informed of the contents of the foregoing Certificate of Incorporation, they executed the same voluntarily on the date the same bears date.

GIVEN under my hand and official seal of office this _____ day of March _____ 1984.

_____
Notary Public

(SEAL)

My commission expires: 12/20/86

-4-

PLAINTIFF'S EXHIBIT C

COUNTY COMMISSION MEETING
Monday June 11, 1984 – Eufaula

The Barbour County Commission held its regular monthly meeting in the Eufaula Courthouse on Monday, June 11, 1984. The meeting was called to order at 9:00 A.M. by Chairman J. Herbert Beasley. Upon roll call, all members were present. Minutes of the last regular meeting on May 14, 1984 and of the special called meeting on May 30, 1984 had been typed and copies mailed to all Commissioners and the County Attorney, and each acknowledged receipt of the minutes. Chairman Beasley requested any additions or corrections to the minutes and there were none. Motion made by Mr. Griffin that the minutes of both meetings be approved; motion seconded by Mr. Hartzog and carried unanimously.

FUNDS APPROVED FOR CLIO NUTRITION SITE: Mrs. Jewel B. Price, Site Manager of the Clio Nutrition Site (Fellowship Hall) met with the Commission along with a delegation from the Clio area to request financial assistance in the transportation program at the site. The buses used to transport the elderly to the site for meals have required major maintenance repairs in the last weeks. Mrs. Price stated that $730.41 had been spent on the 1976 Plymouth bus in May and the other van, a 1969 Ford is now in the shop with transmission trouble with the estimated cost of this repair to be over $400.00. She also requested the Commission consider buying new buses and trading in the old ones. Chairman Beasley requested they bring the old buses to the County Shop along with the maintenance records on each vehicle so the County mechanic can check the general condition of each and make a recommendation regarding trading in or continue maintenance on the present buses. After further discussion, motion was made by Mr. Wilkerson that the Commission grant $1,000.00 from Revenue Sharing Funds to the Clio Nutrition Site to assist them in the transportation program for the elderly and to include the Chairman's recommendation; motion seconded by Mr. Hartzog and carried unanimously. These funds will be from the Revenue Sharing Fund budget for the aging program.

BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY CREATED: Mr. J. Gorman Houston, Attorney, met with the Commission to discuss Governor George C. Wallace Executive Order No. 26 authorizing the creation of the Barbour County Historical Preservation Authority and advised that the necessary papers have been filed with the various agencies. After discussion of this matter, the following Resolution was offered by Mr. Williams.

R E S O L U T I O N

WHEREAS, on March 28, 1984, CHARLES L. ROGERS, LYNN M. MacELVAIN, and LOUELLA HOBBS, residents and qualified electors and property owners of Barbour County, Alabama applied for authority to incorporate the BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY;

WHEREAS, GOVERNOR GEORGE C. WALLACE signed Executive Order Number 26 on June 6, 1984, authorizing the creation of the BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY, and,
WHEREAS, The Certificate of Incorporation of the BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY was filed in the Office of the Secretary of State of the State of Alabama on June 8, 1984 and now therefore,

BE IT RESOLVED BY THE BARBOUR COUNTY COMMISSION, the Governing Body of Barbour County, Alabama, that CHARLES L. ROGERS be and he hereby is appointed Chairman of the BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY for a period of six (6) years; that LYNN M. MacELVAIN is appointed Secretary of the BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY to serve for a period of four (4) years; and LOUELLA HOBBS is appointed as Vice-Chairman of the BARBOUR COUNTY HISTORICAL PERSERVATION AUTHORITY to serve for a term of two (2) years.

This the 11th day of June, 1984.

THE BARBOUR COUNTY COMMISSION
Governing Body of Barbour County, Alabama

ATTEST:

/s/ F. Dean Brown
DEAN BROWN, Clerk

By: /s/ J. Herbert Beasley, Jr.
J. HERBERT BEASLEY, JR., Chairman

Motion made by Mr. Griffin that the Resolution be adopted; motion seconded by Mr. Comer and carried unanimously.

REPORT GIVEN ON HOSPITAL SALE: Mr. Gorman Houston, Chairman of the Barbour County Hospital Association gave a report on the financial condition of the association and the sale of the hospital. Mr. Houston advised that the association had spent $165,000.00 for indigent care and now have $700,000.00 on investments from the sale of the hospital. The association has held up the sale from Brookwood to Health Crest until a solution is reached regarding the agreement of the original sale that $2 million would be spent on capital improvements in the next five years after the sale. Everything should be worked out for the sales to be completed by June 30, 1984.

HEALTH DEPARTMENT BUILDING IN EUFAULA DEEDED TO HOSPITAL ASSOCIATION: Mr. Houston also advised that the Hospital Association had agreed to accept title to the County Health Department office and building on North Orange Street in Eufaula as requested by the Commission earlier. The Commission unanimously approved the County Attorney transferring title to the Barbour County Hospital Association for the Eufaula Health Department Building and lot.

ACREEMENT APPROVED FOR CUTTING COUNTY PAVED ROADS: Mr. Douglas Hartzog met with the Commission

MINUTES OF THE FIRST MEETING OF THE BOARD OF DIRECTORS
OF THE BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY
HELD ON JUNE 25, 1984

PLAINTIFF'S
EXHIBIT
D

The first meeting of the Board of Directors of the Barbour
County Historical Preservation Authority, a public corporation,
was held in Eufaula, Alabama on the ___25th___ day of June, 1984, at
__5__ o'clock P.M.

It was noted that the County Commission of Barbour County,
Alabama, the governing body of said Barbour County, Alabama, did
on the 11th day of June, 1984, elect the following persons as
Directors of the above-stated public corporation to serve for
staggered terms, all in accordance with the requirements of
Sections 41-10-135, et seq, Code of Alabama, 1975:

     Louella Hobbs, for a term of two years
     from date of election

     Lynn M. MacElvain, for a term of four years
     from date of election

     Charles L. Rogers, for a term of six years
     from date of election

Motion was made by Lynn M. MacElvain that Charles L. Rogers
be elected Chairman of the Board of Directors of the corporation;
this motion was duly seconded by Louella Hobbs and upon vote by
the Board, Mr. Rogers was unanimously elected Chairman of the
Board of Directors of the corporation.

Upon the above-said election, the said Mr. Rogers occupied
the chair of Chairman of the Board of Directors and presided over
the Board of Directors meeting.

Motion was made by Lynn M. MacElvain and seconded by Charles
L. Rogers that Louella Hobbs be elected Vice Chairman of the Board
of Directors of the corporation, and upon vote by the Board
Louella Hobbs was unanimously elected Vice Chairman of the Board
of Directors of the corporation.

Motion was made by Louella Hobbs and seconded by Charles L.
Rogers that Lynn M. MacElvain be elected Secretary of the corpora-
tion and of its Board of Directors and upon vote by the Board,
Lynn M. MacElvain was unanimously elected Secretary of the corpo-
ration and of its Board of Directors.

Motion was made by Louella Hobbs and seconded by Charles L.
Rogers that Lynn M. MacElvain be elected Treasurer of the corpora-
tion and of its Board of Directors, and upon vote by the Board,

Lynn M. MacElvain was unanimously elected Treasurer of the corpo-
ration and of its Board of Directors.

Upon the above-said elections, Louella Hobbs assumed the of-
fice of Vice Chairman of the Board and Lynn M. MacElvain assumed
the offices of Secretary and Treasurer of the corporation and of
its Board of Directors.

There was a motion by Louella Hobbs that the Secretary of the
corporation purchase a seal, which shall be the official legal
seal of said public corporation, to read as follows:  "BARBOUR
COUNTY HISTORICAL PRESERVATION AUTHORITY, CORPORATE SEAL."  Motion
was properly seconded by Charles L. Rogers and upon vote, the mo-
tion passed unanimously.

There was a discussion concerning the Bylaws of the corpora-
tion and a set of proposed Bylaws was read to the Board of Direc-
tors at said meeting.  There was a motion by Charles L. Rogers
that the Bylaws as proposed and read be adopted in full by the
corporation as the Bylaws of said public corporation, and that a
copy of the said Bylaws be attached to these minutes and made a
part hereof as if fully set out herein.  Said motion was duly
seconded by Louella Hobbs and upon vote, said motion passed unani-
mously.

Discussion was next held concerning a proposed project to be
leased to Jack J. Rusch.  After a thorough review of the proposed
project, the following resolution was introduced in writing, duly
seconded and unanimously adopted by the vote of all members of the
Board of Directors:

<div align="center">

A RESOLUTION AUTHORIZING AN AGREEMENT
WITH JACK J. RUSCH

</div>

"BE IT RESOLVED BY THE BOARD OF DIRECTORS OF BARBOUR COUNTY
HISTORICAL PRESERVATION AUTHORITY (the "Authority") as follows:

1.  An inducement agreement (the "Inducement Agreement") be-
tween the Authority and Jack J. Rusch in substantially the form
and of substantially the content as the form of Inducement Agree-
ment attached hereto as Exhibit A, with such changes or additions
thereto or deletions therefrom as the Chairman of the Authority
shall approve, which approval shall be conclusively evidenced by
his executing the same as hereinafter provided, is hereby ap-
proved, adopted, authorized, ratified and conformed.

2.  The Chairman of the Authority is hereby authorized and
directed to execute and deliver the Inducement Agreement for and

on behalf of and in the name of the Authority. The Secretary of
the Authority is hereby authorized and directed to affix the of-
ficial corporate seal of the Authority to such Inducement Agree-
ment and to attest the same."

The motion for adoption of the foregoing resolution was duly
seconded and, upon the same being put to vote, the following vote
was recorded:

Yeas:                                    Nays:

Ms. Louella Hobbs                        None
Ms. Lynn M. MacElvain
Mr. Charles L. Rogers

The Chairman thereupon announced that the motion for the
adoption of said resolution had been carried.

There being no further business to come before the meeting it
was moved and seconded that the meeting be adjourned. Motion
carried.

Minutes approved:

_____
Chairman

SEAL

Attest: _____
                    Secretary

## WAIVER OF NOTICE

The undersigned, being all of the Directors of the Barbour County Historical Preservation Authority, a public corporation, do hereby waive any and all notice of the time, place and purpose of the first meeting of the Board of Directors of said Board which meeting is called to be held in Eufaula, Alabama, on the _25th_ day of June, 1984, at _5_ o'clock _P_.M. and do hereby ratify and apporove the action taken at said meeting of which the foregoing is the minutes.

WITNESS our hands this _25th_ day of June, 1984.

_Louella Hobbs_
Louella Hobbs

_Lynne M. Mac Elvain_
Lynn M. MacElvain

_Charles L. Rogers_
Charles L. Rogers

Page 1 of
Instrument ID:
OFFR Book: E275 Page:
4/18/2005 11:56:34
Barbour County
Nancy D. Roberts
Judge of Probat
Recording Fee: 155.
Taxes: 4.
Total: 155.

PLAINTIFF'S
EXHIBIT
E

INDUCEMENT AGREEMENT between BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY, a public corporation organized and existing under the laws of the State of Alabama (herein called the "Authority") and JACK J. RUSCH, an individual residing in Eufaula, Alabama, (herein for purposes of this agreement called the "Company"),

## R E C I T A L S

The Company is considering the location of a hotel, apartment, restaurant and commercial facility which facility is to be located on certain parcels of land in or near the City of Eufaula, Alabama which is to be leased by the Authority and more fully described in Exhibit A attached hereto and made a part hereof (said parcels of land being herein called the "Site"). The Authority believes that the location of the facility under consideration by the Company will promote the preservation of and interest in property listed in the National Register of Historic Places. Therefore, in order to induce the Company to locate its facility in or near the City of Eufaula, Alabama, the Authority proposes (i) to acquire the Site, (ii) to renovate the existing buildings (herein called the "Building") satisfying the requirements of the Company, (iii) to acquire and install in the Building certain necessary machinery and equipment (herein together called the "Equipment") specified by the Company, (iv) to lease the Site, the Building and the Equipment (which are herein together called the "Project") to the Company, (v) if and to the extent desired by the Company and to the extent authorized by law, to issue its bond anticipation notes for the purpose of temporarily financing the cost of leasing, acquiring, and equipping the Project, and (vi) to sell and issue its long-term revenue bonds for the purpose of refunding such bond anticipation notes and otherwise providing for the permanent financing of such cost. The Company, on its part, desires to accept the proposal of the Authority and to make such agreements with the Authority as are necessary to enable the Authority to proceed with the undertakings on its part herein contained prior to the issuance of the aforesaid longterm revenue bonds.

NOW, THEREFORE, in consideration of the aforesaid recitals and the respective agreements on the part of the Authority and the Company herein contained, said parties hereby agree as follows:

Section 1. In order to finance temporarily such amount of "Project Costs" (as defined in Section 4 hereof) as may be desired by the Company, the Authority will, to the extent authorized by law, borrow, as from time to time required, such amounts as the Company shall request and will issue in evidence of such borrowing its bond anticipation notes (herein called the "Bond Anticipation Notes"), it being

currently estimated that the total amount of Project Costs to be financed thereby will not exceed $1,500,000. The Bond Anticipation Notes shall mature on such dates, shall bear such rate or rates of interest and shall contain or be subject to such other terms and conditions as shall be mutually agreeable to the Authority and the Company. In order to secure the payment of the principal of and the interest on the Bond Anticipation Notes, the Authority, the Company and the lender making the loan to be evidenced by the Bond Anticipation Notes shall enter into a loan agreement which will obligate the Company either (i) to enter into a lease with the Authority and to take such other actions as will enable the Authority to issue Bonds (as defined in Section 2 hereof) in a principal amount sufficient to pay the principal of and the interest on the Bond Anticipation Notes on or before the respective due dates of such principal and interest or (ii) in default of concluding arrangements which enable the Authority to issue such Bonds, to pay the Authority such amounts at such times as shall be required to pay the principal of and the interest on the Bond Anticipation Notes on or before the respective due dates of such principal and interest.

Section 2.    In order to retire any Bond Anticipation Notes issued at the request of the Company and to finance any "Project Costs" (as defined in Section 4 hereof) not initially financed through the issuance of Bond Anticipation Notes, the Authority will sell and issue such principal amount of long-term revenue bonds (herein called the "Bonds") as the Company shall request, it being currently estimated that the Bonds will not be issued in an aggregate principal amount exceeding $1,500,000. As more particularly provided in Section 5 hereof, the Company will enter into a lease obligating the Company to pay rentals to the Authority sufficient to cover the debt service with respect to the Bonds. The Bonds shall be sold and issued pursuant to such terms and conditions (e.g., price, maturities, interest rates, denominations, redemption provisions, etc.) as shall be mutually agreeable to the Authority, the Company, and the purchaser of the Bonds, which purchaser (herein called the "Purchaser") shall be designated by the Company.

Section 3.    Either before or simultaneously with the issuance of the Bonds, the Authority will acquire the Site on such terms as shall be acceptable to the Company. The Authority will renovate the Building in accordance with such plans, specifications and other requirements as the Company shall specify. The Authority will also acquire such items of the Equipment as the Company shall specify and shall install the same in or about the Building in accordance with the Company's directions. All undertakings of the Authority herein provided for with

-2-

respect to the Site, the renovation of the Building and the acquisition and installation of the Equipment are herein together called the "Project Work".

Section 4.  The Authority will issue the Bond Anticipation Notes or the Bonds, as the case may be, for the purpose of obtaining funds to pay all Project Costs.  For purposes of this Agreement, Project Costs shall mean the following:

(a)  all costs of acquiring the Site;

(b)  all costs incurred in renovating the Building and providing for adequate parking space, including, without limitation, the costs of planning and engineering (whether performed by personnel of the Company or by other suppliers of such services), the costs of labor and management, the costs of insurance and contract bonds and the costs of material and equipment used in renovating the Building;

(c)  the costs of acquiring the Equipment and installing the same in the Building, including, without limitation, the costs of planning and engineering with respect to such equipment (whether performed by personnel of the Company or by other suppliers of such services); and

(d)  to the extent permitted by applicable state and federal law, the expenses of issuing the Bonds and such capitalized interest on the Bonds as the Company, with the approval of the Purchaser, shall consider necessary.

Prior to the issuance of any Bond Anticipation Notes, and, if no Bond Anticipation Notes are issued, prior to the issuance of the Bonds, the Authority shall not be required to take any action pursuant to this Agreement which requires the payment of any Project Costs, unless the Company pays such costs for the account of the Authority or lends the Authority the funds necessary to pay such costs.  If provided by the Company with the necessary funds to pay the Project Costs incurred in connection therewith, the Authority will perform such of its obligations hereunder as may be requested by the Company prior to the issuance of any Bond Anticipation Notes or prior to the issuance of the Bonds, as the case may be.

Section 5.  In connection with the issuance of the Bonds, the Authority will enter into a lease agreement (herein called the "Lease") with the Company under which the Authority will lease the Site, Building and Equipment to the Company for rentals sufficient to provide for the payment, when due, of the principal of and interest on the Bonds.  The

Lease will otherwise contain such terms and conditions as shall be mutually agreeable to the Authority, the Company and the Purchaser; provided, however, that in any event the Lease shall provide for (i) a primary lease term extending until the final maturity of the Bonds and (ii) an option on the part of the Company to purchase the Project at any time after all the Bonds and the Bond Anticipation Notes shall have been paid in full for a purchase price not exceeding $1,000.

Section 6.    The Bonds shall be issued under and secured by a mortgage or a mortgage and trust indenture (herein called the "Mortgage" or "Indenture") between the Authority and a bank or trust company, as mortgagee or trustee (herein called the "Mortgagee" or "Trustee"), and the Authority will designate as the Mortgagee or Trustee the bank or trust company nominated and approved by the Company and the Purchaser. The Mortgage or Indenture will contain, for the benefit of the holders of the Bonds, (i) a pledge to the Mortgagee or Trustee of the revenues and receipts derived by the Authority from the leasing or sale of the Project, (ii) an assignment to the Mortgagee or Trustee of all right, title and interest of the Authority in and to the Lease, and (iii) a mortgage on the Project to secure payment of the Bonds. The Mortgage or Indenture will also contain such other provisions as shall be mutually agreeable to the Authority, the Company, the Mortgagee or Trustee and the Purchaser.

Section 7.    The Authority hereby appoints and designates the Company as its general agent, and does hereby authorize and direct the Company to act as such agent, for the purpose of taking all actions and doing all things, whether before or after the issuance of the Bonds, necessary or convenient to accomplish the Project Work, including, without limiting the generality of the foregoing, such actions and things as may be necessary or convenient for (i) the selection of all machinery, equipment and materials that are to constitute part of the Equipment, (ii) the selection of all suppliers of such machinery, equipment and materials and the negotiation of the terms and conditions of all sales contracts pursuant to which such machinery, equipment and materials are to be purchased, (iii) the execution and delivery, in the name and behalf of the Authority, of purchase orders and other contracts for the purchase of such machinery, equipment and materials, and (iv) the negotiation and settlement of any matter in dispute with any supplier of machinery, equipment and materials purchased in connection with the Project Work.

The appointment and authorization of the Company to act as the general agent of the Board in connection with the

-4-

Project Work shall not be construed to require the Company to employ any other person, firm or corporation to perform any particular task related to the accomplishment of such work, and the Company may, if it so desires, perform all or any part of such work itself in lieu of employing any other person, firm or corporation to perform such work or part thereof. Without limiting the generality of the foregoing, the Company may itself perform all Project Work and may enter into a contract with the Authority covering all such work, or it may, in the exercise of its discretion, cause such work or a portion thereof to be performed pursuant to one or more contracts with contractors other than itself, in which case it may, as the agent of the Authority, enter into such contracts in the name and behalf of the Authority. Nothing herein contained, however, shall relieve the Company from its obligation, as the agent of the Authority, to cause all phases of the Project Work to be performed in accordance with all applicable laws, ordinances and regulations of governmental bodies, and if the Company cannot itself lawfully perform any part of the Project Work it will cause appropriately licensed and qualified persons, firms or corporations to be employed by the Authority to perform such part of the Project Work.

In addition to all other powers and duties of the Company as the general agent of the Authority in connection with the Project Work, the Company shall have the power, hereby granted by the Authority, to appoint as an agent of the Authority any person, firm or corporation having a contract to perform any part of the Project Work, irrespective of whether such contract is directly with the Authority or is a subcontract with a person, firm or corporation other than the Authority. Any agent of the Authority so appointed by the Company (such agent being herein called "Company Appointed Authority Agent") shall be authorized to act for and in the name and behalf of the Authority to the same extent that any provision of this Agreement authorizes the Company to act for and in the name and behalf of the Authority; provided, however, that the Company may limit the power of any Company Appointed Authority Agent to act for the Authority to such extent as the Company, in the exercise of its discretion, may deem desirable. The Company may exercise its power to appoint any Company Appointed Authority Agent (i) either by causing such appointment to be recognized in any contract or subcontract providing for the employment of such agent in connection with the Project Work, or (ii) by evidencing such appointment in a written instrument other than such contract or subcontract, a copy of which instrument is to be furnished to the Authority. The appointment by the Company of a Company Appointed Authority Agent shall be effective without any further approval, ratification or other action on the part of the Authority, and such appointment shall continue effective

-5-

unless terminated by a resolution of the Board of Directors
of the Authority, which termination shall not be effective
until a certified copy of such resolution shall be delivered
to the Company and to such Company Appointed Authority Agent.
Insofar as any liability of the Authority for acts of any
Company Appointed Authority Agent may be concerned, the Com-
pany shall be and remain responsible for all actions of such
agent to the same extent as if such actions were the actions
of the Company itself.

In the event that, pursuant to any provisions of this
Agreement [including, without limitation, subparagraph (a) of
Section 8 hereof], the Company or any Company Appointed
Authority Agent issues any purchase order or enters into any
contract in the name of the Authority which is not executed
by an Authorized Authority Representative (as provided for in
Section 15 hereof), the Company will, if given standing writ-
ten instructions by the Authority to do so, promptly furnish
a copy of each such purchase order or contract to the Chair-
man of the Board of Directors or cause a copy thereof to be
furnished to said Chairman.

Section 8.  In order to enable all machinery and equip-
ment forming a part of the Equipment and all equipment, fur-
nishings, materials and supplies used in renovating the
Building (all such machinery, equipment, furnishings, mate-
rials and supplies being herein together called the "Project
Material") to be purchased for and in the name of the Author-
ity without such purchase being subject to any sales or use
tax imposed by the State of Alabama or any political subdivi-
sion or taxing authority thereof, the Authority and the Com-
pany hereby agree that all items of the Project Material
shall be purchased in accordance with the succeeding provi-
sions of this Section 8:

(a)  The Company or any Company Appointed Authority
Agent shall have the right to issue purchase orders or
enter into contracts for the purchase of any needed item
of Project Material in the name and behalf of the
Authority.

(b)  Notwithstanding the authorization of the Com-
pany or any Company Appointed Authority Agent to act as
agent of the Authority in issuing purchase orders or
entering into contracts for the purchase of Project
Material in the name and behalf of the Authority, the
Authority will cause any purchase order or contract for
the purchase of any item of Project Material to be exe-
cuted in its name and behalf by an Authorized Authority
Representative (as provided for in Section 15 hereof)
within a reasonable time after request therefor by the
Company or any Company Appointed Authority Agent.

-6-

(c) Irrespective of whether a purchase order or contract is executed and delivered by the Company or a Company Appointed Authority Agent pursuant to the preceding subsection (a) or by an Authorized Authority Representative pursuant to the preceding subsection (b), such purchase order or contract shall in either case constitute a valid contract on behalf of the Authority and shall, subject to the provisions of Section 9 hereof, obligate the credit of the Authority for the payment of the purchase price of the item or items of Project Material covered by such purchase order or contract.

(d) In the event that payment for the purchase price of any item of Project Material becomes due at any time when proceeds from the Bonds are not available for the payment of such purchase price, the same shall be paid by the Authority out of moneys on deposit in the Project Account created pursuant to Section 11 hereof, or, at the option of the Company, such purchase price may be paid directly by the Company or by a Company Appointed Authority Agent in the name and behalf of the Authority, it being understood and agreed that any amount so paid directly by the Company or a Company Appointed Authority Agent shall constitute a loan to the Authority secured by a lien upon the Project Material, all as more particularly provided in Section 11 hereof.

(e) The Authority shall take title to all items of the Project Material purchased in its name and behalf. If any contract or subcontract for any part of the Project Work provides for any items of the Project Material to be furnished pursuant thereto, such contract or subcontract shall reserve to the Authority the right to purchase such items of the Project Material directly, in which case the purchase price of such items paid by the Authority, together with any savings in sales or use tax resulting from the purchase of such items by the Authority, shall be deducted from the total amount otherwise due the contractor or subcontractor under such contract or subcontract and the Authority shall take title to such items directly from the vendor or supplier of such items without title thereto ever passing through the contractor or subcontractor.

Section 9. Nothing contained in this Agreement shall be construed to impose a charge against the general credit of the Authority, and all obligations of the Authority arising under this Agreement (including, without limitation, all contracts in connection with the Project Work) shall be limited to the proper application of (i) the proceeds derived by the Authority from the issuance of Bond Anticipation Notes and

the Bonds and (ii) the proceeds of loans made by the Company
to the Authority pursuant to this Agreement.

In order to assure that all obligations of the Authority
incurred in connection with the Project Work shall be limited
in accordance with the provisions of this Section, no pur-
chase order shall be issued in the name and behalf of the
Authority and no contract shall be entered into in the name
and behalf of the Authority, whether in either case by the
Authority itself or by the Company or a Company Appointed
Authority Agent acting as agent for the Authority, unless
there shall be printed, stamped, endorsed or otherwise noted
on such purchase order or contract a legend reading substan-
tially as follows:

"The obligation of Barbour County Historical Preser-
vation Authority to pay any moneys that become due under
(this contract) (the contract resulting from the sell-
er's acceptance of this purchase order) shall be limited
solely to the proper application of (i) any funds lent
by Jack J. Rusch to said Authority pursuant to the pro-
visions of that certain Inducement Agreement between
said Authority and Jack J. Rusch dated as of June _25_,
1984, (ii) the revenues and receipts derived by said
Authority from the leasing or sale of the "Project" re-
ferred to in said Inducement Agreement, and (iii) the
proceeds derived by said Authority from any bond antici-
pation notes and long-term revenue bonds which it may
hereafter issue in order to finance undertakings for
Jack J. Rusch pursuant to said Inducement Agreement."

In the event that the Authority shall become obligated pur-
suant to any purchase orders or other contracts in connection
with the Project Work and in the event that amounts shall
become due from the Authority under such purchase orders or
contracts prior to the issuance of the Bond Anticipation
Notes or the Bonds, or at any other time when proceeds of the
Bond Anticipation Notes or the Bonds are not available for
the payment of such amounts, then and in such events, the
Company shall promptly pay all such amounts for the account
of the Authority or furnish to the Authority , on a timely
basis, funds sufficient for the payment of such amounts.

Section 10. Without in any way limiting the right or
power of the Company or any Company Appointed Authority Agent
to act as agent for the Authority pursuant to the provisions
of Sections 7 and 8 hereof, the Authority, in order to give
further assurances to the Company, will execute and deliver,
or cause to be executed and delivered, all contracts, orders,
requisitions, instructions and other written instruments and
do, or cause to be done, all other acts or things that may,

-8-

in the opinion of the Company, be necessary or convenient to accomplish the Project Work or any part thereof and to perform fully the obligations of the Authority contained in this Agreement. In no event, however, will the Authority cause or permit any of its officers, agents or representatives (other than the Company or Company Appointed Authority Agents) to execute and deliver any contract or to make any agreement or commitment, whether written or oral, with respect to the Project Work or any part thereof unless such action by such officers, agents or representatives of the Authority is specifically requested by the Company in writing.

Section 11. In order to facilitate advances to the Authority and the disbursement of such advances for payment of the Project Costs, the Company shall have the right to establish a special trust account (hereinafter called the "Project Account"), in the name of the Authority, with any bank of the Company's choice (the bank serving as the depository of such account being hereinafter called the "Depository Bank"). The Company as agent for the Authority may make such agreements with the Depository Bank respecting the duties, rights, liabilities and immunities of the Depository Bank in connection with the Project Account as shall be mutually agreeable to the Company and the Depository Bank. The Company may deposit in the Project Account such amounts as are from time to time necessary to pay Project Costs then due and payable. The agreement between the Company and the Depository Bank shall permit moneys to be disbursed from the Project Account pursuant to checks drawn thereon in the name of the Authority and signed by authorized officers or representatives of the Company, as agent for the Authority. Alternatively, the Company may arrange for the Depository Bank to disburse moneys from the Project Account in the name of the Authority pursuant to requisitions submitted by the Company, as agent for the Authority.

The cumulative total of

(a) all moneys which are deposited by the Company in the Project Account to the credit of the Authority and which are disbursed from said account for payment of Project Costs,

(b) any other moneys which the Company may have heretofore advanced, or may hereafter advance, to the Authority for the payment of Project Costs,

(c) all moneys which the Company or any Company Appointed Authority Agent may have heretofore paid, or may hereafter pay, directly to any contractor or vendor,

-9-

for the account of the Authority, in respect of any
Project Costs, and

> (d)   all other Project Costs heretofore or here-
after incurred and paid directly by the Company,

shall constitute a non-interest bearing loan by the Company
to the Authority (herein called the "Project Loan"). In
order to secure to the Company the repayment of the principal
of such loan, the Authority hereby grants to the Company a
security interest in all Project Material to which the
Authority may at any time acquire title.

In the event that the Authority reimburses or pays the
Company any portion of the Project Loan that is referable to
amounts expended by a Company Appointed Authority Agent for
the account of the Authority, or in the event that the
Authority is otherwise discharged from liability for the
outstanding balance of the Project Loan in accordance with
the provisions of this Agreement, then, in either of such
events, the Authority shall have no further liability to such
Company Appointed Authority Agent in respect of such portion
of the Project Loan referable to expenditures by such Company
Appointed Authority Agent.  In consideration of the Author-
ity's liability to the Company for all amounts paid for the
account of the Authority by Company Appointed Authority
Agents, the Company hereby assumes responsibility for the
reimbursement of all such amounts to such agents respectively
entitled thereto.

The Authority will, promptly following the sale and
issuance of the Bonds, apply so much as may be necessary of
the proceeds therefrom, first, to the retirement of any Bond
Anticipation Notes then outstanding and, second to the repay-
ment of the Project Loan, and to the extent that the proceeds
of the Bonds are not needed for the retirement of Bond Anti-
cipation Notes, the Authority does hereby expressly assign
such amount of such proceeds to the Company as security for
the repayment of the Project Loan; provided, however, that
the Authority shall be obligated to apply for the repayment
of the Project Loan only so much of the proceeds of the Bonds
as, in the opinion of bond counsel acceptable to the Author-
ity and the Company, will not cause the interest on such
bonds to lose the exemption from federal income taxation
available upon compliance with the provisions of Section
103(b)(6) of the Internal Revenue Code of 1954, as amended,
and the applicable regulations thereunder.  Further, the
Company's agreement with the Depository Bank shall provide
that any unexpended moneys on deposit in the Project Account
at the time of the issuance of the Bonds are to be paid
either (i) to the Company, or (ii) to the Mortgagee or

-10-

Trustee for deposit in the special trust fund to be created under the Mortgage or Indenture for payment of Project Costs.

October 1, 1984

Section 12.    In the event that the Bonds are not issued by ~~July 1, 1985~~, or in the event that the Company gives written notice to the Authority of its desire to cancel this Agreement prior to the issuance of any Bond Anticipation Notes or the Bonds, then in either of such events, this Agreement shall terminate (subject to the survival of the indemnity provisions contained in Section 13 hereof), and neither the Authority nor the Company shall thereafter have any rights hereunder against the other nor shall any third parties have any rights hereunder against either the Authority or the Company, except that

(a)    the Company shall reimburse the Authority for all Project Costs which it incurred, with the Company's approval, and which were not paid for the account of the Authority with moneys constituting part of the Project Loan;

(b)    the Authority will assign to the Company, and the Company shall assume and be responsible for, all contracts in connection with the Project Work which the Authority has, at the Company's request, entered into, or which the Company has, as the agent of the Authority, entered into in behalf of the Authority, or which the Company has assigned to the Authority; and

(c)    the Company shall pay to the Authority's regular counsel, and to any bond counsel engaged on behalf of the Authority, reasonable fees for legal service relating to the transactions contemplated by this Agreement.

Upon the termination of this Agreement as provided in the first paragraph of this Section 12, the Authority will convey to the Company all property and interests in property (whether real, personal or mixed) constituting part of the Project to which the Authority has theretofore acquired title, and the Company shall require the Depository Bank to pay to the Company any unexpended moneys that are then on deposit in the Project Account. Such conveyance of all property constituting part of the Project to the Company and such payment to the Company of all unexpended moneys then held in the Project Account shall constitute full acquittal and discharge of the Authority from the obligation to repay any then outstanding balance of the Project Loan.

-11-

<u>Section 13</u>.  The Company releases the Authority from, and will indemnify and hold the Authority harmless against, any and all claims and liabilities of any character or nature whatsoever asserted by or on behalf of any person, firm, corporation or governmental authority arising out of, resulting from, or in any way connected with the Project Work, including, without limiting the generality of the foregoing,

(a)  obligations for the payment of any Project Costs which are not paid because the Company fails to pay such costs itself and fails also to lend the Authority sufficient moneys pursuant to this Agreement to pay such costs,

(b)  any destruction of or damage to property or any injury to or death of any person or persons caused by or related to the Project Work, and

(c)  any actions taken by the Authority at the request of the Company in connection with the offering or sale of any of the Bonds.

The Company will also pay or reimburse all legal or other expenses reasonably incurred by the Authority in connection with the investigation or defense of any action or proceeding, whether or not resulting in liability, with respect to any claim, liability or loss in respect of which indemnity may be sought against the Company under the provisions of this Section 13.

The agreement of the Company to indemnify and hold the Authority harmless against the aforesaid claims and liabilities shall be superseded by an equivalent indemnity agreement contained in other instruments to be executed and delivered by the Company contemporaneously with the issuance of the Bonds, but in the event such other instruments are not so executed and delivered by the Company, the indemnity agreement of the Company contained in this Section 13 shall survive the termination or cancellation of this Agreement.

Nothing contained in this Section 13 shall be construed to indemnify the Authority against, or to release the Authority from liability for, any claim or liability resulting from (i) its breach of any of the covenants and agreements on its part contained in this Agreement, or (ii) its willful misconduct or gross negligence.

<u>Section 14</u>.  With the prior written consent of the Authority, the Company may, at any time while this Agreement

-12-

is in effect, assign all its rights, privileges and interests hereunder to another person, partnership, firm or company, and upon such assignment becoming effective, any reference to the Company contained herein shall, with the necessary changes in detail, be deemed to refer to the Company's assignee, and such assignee may thereafter proceed with the Project Work and may claim, exercise and enforce all rights, privileges and interest under this Agreement as if it had been an original party hereto; provided, however, that an assignment of the Company's rights, privileges and interests under this Agreement shall not be effective unless the assignee thereof assumes all obligations on the part of the Company contained herein, and if any such assignee claims or attempts to exercise any of the Company's rights, privileges and interest under this Agreement, it shall by such action be deemed to have assumed all such obligations; provided further, that no assignment of the Company's rights, privileges and interests under this Agreement shall discharge the Company from primary liability for all obligations assumed by the Company in Section 13 hereof.

Section 15.  All officers of the Authority are hereby designated "Authorized Authority Representatives" for purposes of this Agreement and are authorized to execute and deliver any agreements, certificates or other instruments, or to take any other actions, all in the name and behalf of the Authority, necessary to consummate or give or give effect to any of the transactions contemplated by this Agreement.  The Authority may at any time and from time to time designate additional, successor or substitute Authorized Authority Representatives by written certificate signed by the Chairman of its Board of Directors and furnished to the Company.

Section 16.  The provisions of this Agreement shall be severable.  In the event any provision hereof shall be held unconstitutional, unenforceable or invalid by a court of competent jurisdiction, such holding shall not render unconstitutional, unenforceable or invalid any other provisions hereof.

Section 17.  The Agreement shall in all respects be governed by and construed in accordance with the laws of the State of Alabama.

IN WITNESS WHEREOF, the Authority and the Company have caused this Agreement to be executed in their respective names, have caused their respective seals to be hereunto affixed, have caused this Agreement to be attested, all by

-13-

their duly authorized officers, in four (4) counterparts, each of which shall be deemed an original, and have caused this Agreement to be dated as of _June 25_ , 1984, although executed by the Authority on _June 25_ , 1984, and by the Company on _June 29_ , 1984, and delivered on behalf of said parties on _June 29_ , 1984.


(SEAL)

ATTEST:

_Lynne M. Mac Elvain_
Its Secretary

                    BARBOUR COUNTY HISTORICAL
                    PRESERVATION AUTHORITY

                    By: _C. L. Rogers_
                    Chairman of Its Board of
                    Directors



                    _Jack J. Rusch_ (L.S.)
                    JACK J. RUSCH

EXHIBIT A
to
INDUCEMENT AGREEMENT
between
BARBOUR COUNTY
HISTORICAL PRESERVATION AUTHORITY
and
JACK J. RUSCH
dated as of June 25, 1984

## Description of Site

Bluff City Inn property at the northwest corner of Broad Street and Eufaula Avenue and property along the east side of Eufaula Avenue known as the Spurlock Warehouse property, all of said property being located in Eufaula, Barbour County, Alabama.

PURCHASE ORDER

Barbour County Historical
Preservation Authority

No._____
Date_____, 1984
Ship via_____
Ship to:_____
_____
_____
_____

Do Not Charge Alabama Sales or Use Tax (See Below).

Invoices must be made out to Barbour County Historical Preservation Authority, c/o Jack J. Rusch, Post Office Box 14,    Eufaula, Alabama 36027. Mail the original and three copies together with bill of lading to:

ALL SHIPMENTS MUST SHOW
PURCHASE ORDER NUMBER

Name_____
Address_____
_____

| ITEM NO. | Quantity | Description | Unit Price | Amount |
|---|---|---|---|---|
| | | | | |

1.  The obligation of Barbour County Historical Preservation Authority, to pay any moneys that become due under (this contract) (the contract resulting from the seller's acceptance of this purchase order) shall be limited solely to the proper application of (i) any funds lent by Jack J. Rusch to said Historical Preservation Authority pursuant to the provisions of that certain Inducement Agreement between said Historical Preservation Authority and Jack J. Rusch dated as of June 25, 1984, (ii) the revenues and receipts derived by said Historical Preservation Authority from the leasing or sale of the "Project" referred to in said Inducement Agreement and (iii) the proceeds derived by said Historical Preservation Authority from the issuance of any long-term revenue bonds, if and when such bonds are issued, in order to finance the project for Jack J. Rusch pursuant to said Inducement Agreement.

2.  All items sold pursuant to this purchase order are exempt from sales tax pursuant to the provisions of Section 41-10-147 and, of Section 40-23-4(11) of the Code of Alabama 1975 and the Rules of the Alabama Department of Revenue.

3.  This purchase order is issued by Barbour County Historical Preservation Authority acting through its agent, Jack J. Rusch.

BARBOUR COUNTY HISTORICAL
PRESERVATION AUTHORITY

ACCEPTED_____

By:_____

Date_____

By: _____

**AMENDMENT NO. 1**
**TO INDUCEMENT AGREEMENT BETWEEN**
**BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY**
**AND JACK J. RUSCH**
**DATED AS OF JUNE 25, 1984**

The undersigned parties hereby amend that certain Inducement Agreement between Barbour County Historical Preservation Authority and Jack J. Rusch dated as of June 25, 1984 by deleting "July 1, 1985" from the second line of Section 12 of said agreement and inserting in lieu thereof "October 1, 1986". In all other respects, said Inducement Agreement remains in full force and effect.

This Amendment No. 1 is effective as of July 1, 1985.

                                        BARBOUR COUNTY HISTORICAL
                                        PRESERVATION AUTHORITY

                                        By: _C. J. Rogers_
                                            Chairman of its Board of
                                            Directors

ATTEST:

_Lynne M. MacElvain_
Its Secretary

(SEAL)

                                        _Jack J. Rusch_
                                        JACK J. RUSCH

446

STATE OF ALABAMA    )
                    )                    WARRANTY DEED
BARBOUR COUNTY      )



PLAINTIFF'S
EXHIBIT
F

KNOW ALL MEN BY THESE PRESENTS: That for and in consideration
of the sum of Ten Dollars ($10.00) and other good and valuable con-
sideration, to J. GORMAN HOUSTON, JR., CELESTE HOUSTON, and BILLY V.
HOUSTON (sometimes herein referred to as Grantors), in hand paid by
BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY, a public corpora-
tion organized and existing under the laws of the State of Alabama
(hereinafter called "The Authority"), the receipt whereof is hereby
acknowledged, J. GORMAN HOUSTON, JR., joined herein by his wife,
MARTHUR M. HOUSTON; CELESTE HOUSTON, a single woman; and BILLY V.
HOUSTON, joined herein by his wife, MARIE D. HOUSTON, have granted,
bargained, sold, and conveyed, and by these presents do hereby
grant, bargain, sell, and convey unto the said Authority, its suc-
cessors and assigns, the following described property situated in
the City of Eufaula, Barbour County, Alabama, to-wit:

    That certain block of real estate in the City of Eufaula,
    Barbour County, Alabama, commencing at the northwest cor-
    ner of Broad Street and Eufaula Avenue, running thence
    North along the West line of Eufaula Avenue, 170 feet and
    6 inches to the lot formerly belonging to the Independent
    Order of Odd Fellows; thence West 68 feet to the Southwest
    corner of the property formerly belonging to the Odd Fel-
    lows; thence North 40 feet to an alley; thence West along
    the South side of said alley 37 feet and 2 inches; thence
    South 210 feet and 6 inches to the North line of Broad
    Street; thence East along the North line of Broad Street
    105 feet and 2 inches to the point of beginning. And the
    improvements thereon, including the building formerly des-
    ignated as the "Bluff City Inn Hotel" and the building on
    the West side of said Hotel Building and occupied for many
    years by the Eufaula Tribune, and now occupied by McPherson
    Engineering and Realty. The lot being designated on the
    City map of Eufaula as part of Lot 5, Block D.

    This Deed is made subject to the provisions of that Con-
    tract of Sale dated February 24, 1984 by and between J.
    Gorman Houston, Jr., and wife, Marthur M. Houston; Celeste
    Houston; and Billy V. Houston and wife, Marie D. Houston,
    as Parties of the First Part, and Jack J. Rusch as Party
    of the Second Part, and specifically the provision that
    the Grantors do not make any warranty of merchantability
    or habitability of the premises since the Party of the
    Second Part had the opportunity to inspect the premises
    including the basement and each floor of the premises, the
    roof of the premises, the wiring and plumbing, etc., and
    the Party of the Second Part agreed to purchase the prem-
    ises "as is" without any warranty of merchantability or
    habitability.

TO HAVE AND TO HOLD unto the said Authority, its successors and assigns, forever.

Grantors do covenant with the Authority, its successors and assigns, that Grantors are lawfully seized in fee of the afore-mentioned premises; that they are free from all encumbrances; that Grantors have a good right to sell and convey the same, as afore-said; and that Grantors will warrant and defend the same unto the said Authority, its successors and assigns, forever, against the lawful claims of all persons.

IN WITNESS WHEREOF, we have hereunto set our hands and seals on this the 22nd day of February, 1985.

_____ (SEAL)
J. GORMAN HOUSTON, JR.

_____ (SEAL)
MARTHUR M. HOUSTON

_____ (SEAL)
CELESTE HOUSTON

_____ (SEAL)
BILLY V. HOUSTON

_____ (SEAL)
MARIE D. HOUSTON

State of Alabama: Barbour County
Filled in Eufaula Office 26 Day of
February 19 85 2:31 M
Recorded In OFFICIAL RECORD
Book 51 Page 996-997
Rec. Fee 6.50 Tax
W. Mool Paine Probate Judge

* * * * * * * *

STATE OF ALABAMA    )
                    )
BARBOUR COUNTY      )              ACKNOWLEDGMENT

I, the undersigned Notary Public, in and for said County, in said State, hereby certify that J. Gorman Houston, Jr. and Marthur M. Houston, husband and wife; Celeste Houston; and Billy V. Houston and Marie D. Houston, husband and wife; whose names are signed to the foregoing conveyance, and who are known to me, acknowledged be-fore me on this day, that, being informed of the contents of said conveyance, they executed the same voluntarily on the day the same bears date.

Given under my hand and seal on this the 22nd day of February, 1985.

_____
Notary Public

(SEAL)                            My Commission Expires: 1-6-86

This Instrument Prepared By:
J. Gorman Houston, Jr.                    997
HOUSTON AND MARTIN, P.C.
P. O. 1

State of Alabama, Barbour County
Filed in Eufaula Offic____ 26 Day
Febers_____ 19 85
Recorded in OFFICIAL RECOR:
Book E__ 91_____ Page 1000
Reo. Fee 400 Tax
____W. mark Price____ Probate Judge
PLAINTIFF'S EXHIBIT

STATE OF ALABAMA )
)
BARBOUR COUNTY )

ABSOLUTE GUARANTY OF PAYMENT
OF OBLIGATION

For value received, I, JACK J. RUSCH, of Deerbrook, Wisconsin, absolutely guarantee payment as due of that note issued by BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY, a public corporation organized and existing under the laws of the State of Alabama, to the order of J. Gorman Houston, Jr., Celeste Houston, and Billy V. Houston, dated the __25th__ day of February, 1985, in the principal amount of Eighty Thousand Dollars ($80,000.00) with interest on the unpaid balance of ten per cent (10%) per annum. If BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY defaults in the payment of One Thousand Fifty-seven Dollars and twenty-one cents ($1,057.21) per month commencing on the __25th__ day of March, 1985 and/or in the payment of One Thousand Fifty-seven Dollars and twenty-one cents ($1,057.21) in each succeeding month thereafter to an including the __25th__ day of February, 1995, I will pay each monthly payment as the same becomes due until the entire unpaid balance thereon with interest is paid upon demand by J. Gorman Houston, Jr., Celeste Houston, and Billy V. Houston.

I waive Notice of Acceptance, Notice of Non-payment, Protest, and Notice of Protest, with respect to the obligation covered hereunder.

This the __25th__ day of February, 1985.

_____ (SEAL)
JACK J. RUSCH

STATE OF ALABAMA )
)
BARBOUR COUNTY )

ACKNOWLEDGMENT

I, the undersigned authority, in and for said County in said State, hereby certify that JACK J. RUSCH, whose name is signed to the foregoing Absolute Guaranty of Payment of Obligation, and who is known to me, acknowledged before me on this day, that, being informed of the contents of said Guaranty, he executed the same voluntarily on the date the same bears date.

Given under my hand this the __25th__ day of February, 1985.

_____
Notary Public
(SEAL)                          My Commission Expires: 7-6-86

STATE OF ALABAMA   )
                      )
BARBOUR COUNTY     )

L E A S E



This Lease, executed on the 25th day of February 1985, by and between BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY, a public corporation organized and existing under the laws of the State of Alabama (hereinafter called "The Authority"), and JACK J. RUSCH, Deerbrook, Wisconsin (hereinafter referred to as the Lessee),

W I T N E S S E T H :

The Authority hereby leases to the Lessee and the Lessee hereby leases from the Authority the property described on Exhibit A which is attached hereto and made a part hereof (which is hereinafter sometimes referred to as "The Project").

The Lessee hereby agrees to pay as rental for the Project the sum of One Thousand Fifty-seven Dollars and twenty-one cents ($1,057.21) per month, payable in advance, commencing on the 25th day of February, 1985, and to pay the like amount on the 25th day of each month thereafter for a period of one hundred and twenty (120) consecutive months. The Lessee hereby agrees to pay as rental for the project the sum of One Hundred Dollars ($100.00) per month for the period commencing on the 25th day of February, 1995, and One Hundred Dollars ($100.00) per month on the 25th day of each month thereafter, for a period of sixty (60) consecutive months.

This Lease shall become effective on the 25th day of February, 1985, and shall run for a term of fifteen (15) years. The Lessee, his heirs or assigns, shall have an option to renew this Lease for an addition period of fifteen (15) years by giving written notice to the Authority of his intention to exercise this option. In the event that the Lessee exercises this option, the rental during the second fifteen (15) year term will be One Hundred Dollars ($100.00) per month, payable on or before the 25th day of each month.

This Lease is made upon the following terms, conditions, and covenants:

1.    The Authority covenants to keep the Lessee in possession of said premises during the term of this Lease.  The Lessee covenants to take good care of said premises and to keep the same in as good repair and condition as the same are in at the commencement of the term of this Lease, normal wear and tear excepted.  The Authority shall not be required to make any repairs of any kind during the term of this Lease.  The Lessee shall be required to keep the interior, outside walls, and roof of said premises in good condition and repair.  The Lessee's repair responsibility shall include, but not be limited to, floor surfaces, air conditioning and heating equipment, registers and grills, windows and plate glass, and interior walls.  The Authority agrees that the Lessee may make such interior changes, repairs, and renovations as may be necessary and incident for the proper utilization of the premises.

2.    It is understood and agreed by and between the Authority and the Lessee that the Authority shall not be liable for any damage which may accrue to the Lessee, its agents, servants, employees, licensees, or invitees, or to any property of the Lessee or any property of any one other than the Lessee on said leased premises on account of any defect in said building or in said premises or from rain, wind, or other cause.  It is specifically understood that the Lessee agrees to indemnify the Authority from any liability for death or injury to any person or persons and for damage to any property arising out of possession of, maintenance and repair, or improvement of the hereinbefore described premises and the sidewalks and streets abutting the same.  The Lessee agrees to obtain liability insurance providing coverage of at least one million dollars ($1,000,000.00) and to pay the premium on the same with the Authority and the Lessee as named insureds.  Should the Lessee fail to obtain such liability insurance or pay the premium thereon to keep the same in effect, then the Authority is author-

- 2 -

ized to do so and any sums paid as premiums by the Authority shall be considered as an advance to the Lessee and payable on demand, together with interest at the rate of ten per cent (10%) per annum.

3. The Authority does not make any warranty of merchantability of the premises. The Lessee has had an opportunity to inspect the premises, including the basement and each floor of the premises, the roof of the premises, the wiring and plumbing, etc., and the Lessee agrees to lease the premises "as is" without any warranty of merchantability or habitability.

4. The Lessee agrees to pay all bills for water, electricity, and other utilities used on said leased premises during this term; to permit no waste of the property or to allow the same to be done, but to take good care of the leased premises. Lessee further agrees not to assign this Lease not sublet any portion of the leased premises except in the regular course of business, without the prior written consent of the Authority endorsed thereon. The Lessee further agrees that upon the termination of this Lease, or upon the termination of the renewal of this Lease in the event that the same is renewed, to surrender quiet and peaceful possession of the leased premises in like good order as at the commencement of this Lease, normal wear and tear excepted.

5. Lessee further agrees that should he fail to pay the monthly rental, as the same becomes due, or if he should violate any of the other conditions of this Lease and fails to remedy such violation after ten (10) days written notice from the Authority to the Lessee, the Authority shall then have the right, at its option, to declare all rental for the entire term due and payable and to re-enter the said leased premises and annul this Lease. Such re-entry shall not bar the recovery of rent or damages for breach of covenant, nor shall the receipt of rent after condition broken be deemed a waiver of forfeiture.

6. If the Lessee vacates the premises before the end of said term, without the written consent of the Authority, the Authority has the right to re-enter and let said premises as the agent of the Lessee herein named, and such re-entry and re-letting shall not discharge the Lessee from liability for rent nor for any other cov-

enant herein contained which is to be kept by the Lessee.  If an ex-
ecution or other process is levied upon the interest of the Lessee in
this Lease, or if a Petition in Bankruptcy is filed by or against the
Lessee in any Court of competent jurisdiction, the Authority shall
hve the right, at its option, to re-enter said premises.

7.  All rent paid hereunder shall be paid to the account of
Barbour County Historial Preservation Authority at Central Bank of
the South, Eufaula, Alabama, at 223 East Broad Street, Eufaula, Ala-
bama, 36027, by depositing the same in the checking account bearing
account number 780 31664    in said bank.

8.  The Lessee agrees to pay all ad valorem taxes and all other
taxes and assessments of any kind levied against the property as the
same become due.  In the event that the Lessee fails to pay such
taxes or assessments as the same become due, then the Authority shall
have the right but not the responsibility of paying said taxes and
assessments, and the Lessee agrees to pay to the Authority the amount
paid for taxes and assessments upon demand by the authority.

9.  The Lessee agrees to keep the premises insured against fire
and other casualty for the Lessee and the Authority, as their inter-
ests may appear, with the buildings insured for an amount not less
than one hundred seventeen thousand, five hundred dollars
($117,500.00).  The Lessee shall also have J. Gorman Houston, Celeste
Houston, and Billy V. Houston as Mortgagees named in said insurance
policy.  The insurance policy shall provide that the insuror cannot
cancel said policy without ten (10) days' notice to the Authority and
to the Mortgagees, J. Gorman Houston, Jr., Celeste Houston, and Billy
V. Houston.  In the event that the Lessee should fail to insure said
property, then the Authority is hereby authorized to do so, and the
premium so paid by the Authority shall be considered as rent due by
the Lessee to the Authority and shall be repaid together with inter-
est at the rate of ten per cent (10%) per annum.  This shall be pay-
able upon demand by the Authority.

— 4 —

10.   It is understood that this is a net Lease and that the
Lessee shall be responsible for paying all insurance premiums, taxes,
assessments, and repairs, and that the Authority shall have no re-
sponsibility whatsoever but to keep the Lessee in peaceable posses-
sion upon the Lessee paying the rent as due and performing the other
conditions.

11.   If the Lessee pays the rental herein reserved to the
Association, the Lessee shall have the right and option, herein
granted by the Association, to purchase the property described here-
in from the Association at any time during the term of this Lease
Agreement, at and for a purchase price equal to a sum which, when
added to the total of the amounts paid by the Lessee, will be suf-
ficient to pay, retire, and redeem all the outstanding bonds issued
by the Authority, namely, Eighty Thousand Dollars ($80,000.00) plus
accrued interest of ten per cent (10%) per annum on the unpaid bal-
ance, plus any sums which have been paid by the Authority for taxes,
insurance, to pay assessments, etc., plus all reasonable fees,
charges, and disbursements for making the transfer from the Authority
to the Lessee, plus the sum of One Hundred Dollars ($100.00); pro-
vided, however, that if on the date of the purchase the bonds have
been paid in full and the Lessee has paid all insurance premiums,
taxes, and assessments against the property, the Lessee shall be
required only the sum of One Hundred Dollars ($100.00) in order to
enable him to exercise such option.  To exercise such purchase op-
tion, the Lessee shall notify the Authority in writing not less than
thirty (30) days prior to the date on which ir proposes to effect
such purchase and, on the date of such purchase, shall pay the
aforesaid purchase price to the Authority in bankable funds, where-
upon the Authority will, by statutory Warranty Deed or other approp-
riate conveyance, transfer and convey the project to the Lessee.
Nothing herein contained shall be construed to give the Lessee any
right to any rebate to or refund of any rental paid by it hereunder

- 5 -

prior to the exercise by it of the purchase option hereinabove granted, even though such rental may have been wholly or partially prepaid.

IN WITNESS WHEREOF, the Parties hereto have hereunto set their hands and seals in duplicate on the day first above written.

LESSOR:

BARBOUR COUNTY HISTORICAL PRESER-
VATION AUTHORITY, a public corpora-
tion organized and existing under
the laws of the State of Alabama

BY: _C. L. Rogers_ (SEAL)

C. L. ROGERS, Its Chairman

ATTEST:

_Lynne M. MacElvain_

LYNNE M. MACELVAIN, Its Secretary

LESSEE:

_Jack J. Rusch_ (SEAL)

JACK J. RUSCH

\* \* \* \* \* \* \* \*

STATE OF ALABAMA    )
BARBOUR COUNTY       )                 ACKNOWLEDGMENT

I, the undersigned authority, in and for said County in said State, hereby certify that C. L. ROGERS, whose name as Chairman of Barbour County Historial Preservation Authority, a public corporation organized and existing under the laws of the State of Alabama, is signed to the foregoing Lease, and who is known to me, acknowledged before me on this day, that, being informed of the contents of the Lease, he as such officer and with full authority, executed the same voluntarily for and as the act of said public corporation.

Given under my hand this the 26th day of February, 1985.

(SEAL)

_Susan Chansley_
Notary Public
My Commission Expires: 12/20/86

- 6 -

STATE OF ALABAMA )
BARBOUR COUNTY )                              ACKNOWLEDGMENT

    I, the undersigned authority, in and for said County in said State, hereby certify that JACK J. RUSCH, whose name is signed to the foregoing Lease and who is known to me, acknowledged before me on this day that, being informed of the contents of the Lease, he executed the same voluntarily on the day the same bears date.
    Given under my hand this the 26th day of February, 1985.

(SEAL)

                                    Notary Public
                                      My Commission Expires: 12/20/86

- 7 -

That certain block of real estate in the City of Eufaula,
Barbour County, Alabama, commencing at the northwest cor-
ner of Broad Street and Eufaula Avenue, running thence
North along the West line of Eufaula Avenue, 170 feet and
6 inches to the lot formerly belonging to the Independent
Order of Odd Fellows; thence West 68 feet to the Southwest
corner of the property formerly belonging to the Odd Fel-
lows; thence North 40 feet to an alley; thence West along
the South side of said alley 37 feet and 2 inches; thence
South 210 feet and 6 inches to the North line of Broad
Street; thence East along the North line of Broad Street
105 feet and 2 inches to the point of beginning.   And the
improvements thereon, including the building formerly des-
ignated as the "Bluff City Inn Hotel" and the building on
the West side of said Hotel Building and occupied for many
years by the Eufaula Tribune, and now occupied by McPherson
Engineering and Realty.  The lot being designated on the
City map of Eufaula as part of Lot 5, Block D.

State of Alabama, Barbour County
Filled in Eufaula Office  26th  Day of
February            19 85   23J  M
Recorded in O F F I C I A L   R E C O R D
Book E  91            Page 1001 — 1008
Rec. Fee  21.50      Tax
Wmrel Price         Probate Judge

EXHIBIT A

THE STATE OF ALABAMA,         )

BARBOUR COUNTY.              )



PLAINTIFF'S EXHIBIT

KNOW ALL MEN BY THESE PRESENTS, that for and in consideration of the sum of One Hundred and no/100 Dollars ($100.00), and other good and valuable consideration, to the undersigned grantors, W. YOUNG JOHNSTON, ROBERT D. POWERS, KENDALL C. POWERS, and WILLIAM H. CLARK, in hand paid by grantee, BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY, a public corporation organized under the laws of the State of Alabama, the receipt whereof is hereby acknowledged; we, the said W. YOUNG JOHNSTON, joined by his wife, FRANCES R. JOHNSTON; ROBERT D. POWERS and KENDALL C. POWERS, husband and wife; and WILLIAM H. CLARK, an unmarried man, do hereby grant, bargain, sell, and convey unto the said BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY, a public corporation organized under the laws of the State of Alabama, hereinafter referred to as Grantee, the following described real estate situated in the City of Eufaula, Barbour County, Alabama, to-wit:

That certain tract of real estate, together with all improvements thereon, described as follows:  From the Southwest corner of the real estate leased by the Grantors to the State of Alabama for use as an ABC Store, as the point of beginning, run thence in a Southerly direction to a point on the North side of Broad Street, which point is 210 feet South 87 degrees 6 minutes West from the West side of Eufaula Street; run thence in an Easterly direction along the North line of Broad Street to the property formerly belonging to the J. L. Houston Estate; run thence along the said J. L. Houston Estate property in a Northerly direction to the Southeast corner of the property leased by the Grantors to the State of Alabama for use as an ABC Store; run thence in a Westerly direction along the South side of the property leased to the State of Alabama 100 feet, more or less, to the point of beginning.

SUBJECT to the following agreements:  That certain agreement between W. Young Johnston, et al, and Wilfred T. Benson, et al, dated April 29, 1967, and recorded in Deed Book DDD, at pages 172-6, in the Probate Office at Eufaula, Alabama, and the amendment thereto dated March 22, 1968, recorded in Miscellaneous Book 8, at pages 27-32.  ALSO, the Contract of Sale dated April 2, 1985, between W. Young Johnston, Robert D. Powers,

Kendall C. Powers, and William H. Clark, as Sellers, and Barbour County Historical Preservation Authority, a public corporation, as Purchaser, and Jack J. Rusch, as Endorser, a copy being attached hereto, including a previous agreement dated March 29, 1985, between W. Young Johnston, Robert D. Powers, Kendall C. Powers, William H. Clark, Dixieland Food Stores, Inc., Barbour County Historical Preservation Authority, a public corporation, and Jack J. Rusch, which is included in said Contract of Sale as Exhibit A; and that certain Addendum to Contract of Sale dated June 20, 1985, between W. Young Johnston, Robert D. Powers, Kendall C. Powers, and William H. Clark, as Sellers, Barbour County Historical Preservation Authority, a public corporation, as Purchaser, and Jack J. Rusch, as Endorser, a copy being attached hereto.

TO HAVE AND TO HOLD, to the said Grantee, its successors and assigns, forever, in fee simple.

And we do, for ourselves and for our heirs, executors, and administrators, covenant with the said Grantee, its successors and assigns, that we are lawfully seized in fee simple of said premises; that they are free from all encumbrances; that we have a good right to sell and convey the same as aforesaid; that we will, and our heirs, executors, and administrators shall, warrant and defend the same to the said Grantee, its successors and assigns, forever, against the lawful claims of all persons.

IN WITNESS WHEREOF, we have hereunto set our hands and seals, this ___lst___ day of ___August___, 1985.

_____ (SEAL)
W. YOUNG JOHNSTON

_____ (SEAL)
FRANCES R. JOHNSTON

_____ (SEAL)
ROBERT D. POWERS

_____ (SEAL)
KENDALL C. POWERS

_____ (SEAL)
WILLIAM H. CLARK

THE STATE OF ALABAMA,          )

BARBOUR COUNTY.                )

I, the undersigned, a Notary Public in and for said state and county, hereby certify that W. YOUNG JOHNSTON and his wife, FRANCES R. JOHNSTON, whose names are signed to the foregoing conveyance and who are known to me, acknowledged before me on this day that, being informed of the contents of the conveyance, they executed the same voluntarily.

GIVEN under my hand and seal, this 1st day of August , 1985.

NOTARY PUBLIC

My Commission Expires: 10-26-88

THE STATE OF ALABAMA,          )

BARBOUR COUNTY.                )

I, the undersigned, a Notary Public in and for said state and county, hereby certify that ROBERT D. POWERS and KENDALL C. POWERS, husband and wife, and WILLIAM H. CLARK, an unmarried man, whose names are signed to the foregoing conveyance and who are known to me, acknowledged before me on this day that, being informed of the contents of said conveyance, they executed the same voluntarily.

GIVEN under my hand and seal, this 1st day of August , 1985.

NOTARY PUBLIC

My Commission Expires: 10-26-88

THIS INSTRUMENT PREPARED BY:
Sam A. LeMaistre, P. C.
Attorney at Law
Post Office Box 548
Eufaula, Alabama  36027

STATE OF ALABAMA      *

BARBOUR COUNTY      *        WARRANTY DEED



PLAINTIFF'S
EXHIBIT
J

KNOW ALL MEN BY THESE PRESENTS: That, for and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, to the Grantor, hereinafter named, in hand paid by the Grantee, hereinafter named, the receipt whereof is hereby acknowledged, I, J. GORMAN HOUSTON, JR., as Trustee of the JACK J. RUSCH TRUST, herein referred to as Grantor, have granted, bargainse, sold, and conveyed, and by these presents do hereby grant, bargain, sell, and convey unto BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY, a public corporation organized and existing under the laws of the State of Alabama (hereinafter called "the Authority"), its successors and assigns, the following described property situated in the City of Eufaula, Barbour County, Alabama, to-wit:

That certain brick warehouse situated on the East side of Eufaula Street in the City of Eufaula, Barbour County, Alabama, and more particularly described as follows: Commence at the South side of an alley that runs East and West between Eufaula Avenue and Randolph Avenue and being the first alley North of Broad Street between these two avenues as the Point of Beginning; run thence in a Southerly direction along the East line of Eufaula Avenue 111'6" more or less to the property of Gloria Barr; run thence in an Easterly direction 35'6" more or less to the wall of the Northeast corner of the property of Gloria Barr; run thence in a Southerly direction along the property of Gloria Barr 20'6" more or less to a wall separating the warehouse to be sold from the building leased to Spires Paw Shop which fronts on Broad Street; run East 38'2" more or less to the building owned by Esther S. Pruett and leased to Dixie Finance Company; run thence in a Northerly direction 130'6" more or less to said alley; run thence in a Westerly direction along the South side of said alley 74' more or less to the Point of Beginning. The property is the old Edmondson Brothers' Warehouse. The property is bounded on the north by an alley, on the east by property of Esther S. Pruett, on the south by Esther S. Pruett, et als. and Gloria Barr, and on the West by Eufaula Avenue. Together with an easement over and across a five foot (5') strip east of this property hereinbefore described and north of the building leased to Dixie Finance Company for the purpose of repairing, painting and maintaining the east wall of the building hereinbefore described.

Including all rights which Esther S. Pruett, et als., have to use Party walls between the property hereinbefore described and the Gloria Barr property, the property of Esther S. Pruett, et als. (The Spires Pawn Shop) and other property of Esther S. Pruett (Dixie Finance Company Building).

TO HAVE AND TO HOLD unto the said Authority, its successors and assigns forever.

Grantor does covenant with the Authority, its successors and assigns, that Grantor is lawfully seized in fee of the aforementioned premises; that they are free from all encumbrances; that Grantor has a good right to sell and convey the same, as aforesaid; and that Grantor will warrant and defend the same unto the said Authority, its successors and assigns, forever, against the lawful claims of all persons.

IN WITNESS WHEREOF, I have hereunto set my hand and seal on this the 28th day of September, 1985.

JACK J. RUSCH TRUST

BY: _____ (SEAL)
J. GORMAN HOUSTON, JR., Trustee

STATE OF ALABAMA        *
                        *       ACKNOWLEDGMENT
BARBOUR COUNTY          *

I, the undersigned Notary Public in and for said County in said State, hereby certify that J. GORMAN HOUSTON, JR., as Trustee of the JACK J. RUSCH TRUST, and whose name is signed to the foregoing conveyance, and who is known to me, acknowledged before me on this day, that, being informed of the contents of said conveyance, he executed the same voluntarily on the day the same bears date.

Given under my hand and seal on this the 28th day of September, 1985.

_____
Notary Public
My Commission Expires: 2/4/87

* S E A L *

This Instrument Prepared By:
James L. Martin
JAMES L. MARTIN, P.C.
P. O. Box 14
Eufaula, Alabama  36027

State of Alabama, Barbour County
Filed In Eufaula Office 2____ Day of
Oct , 1985; 9:22 M
Recorded In O F F I C I A L  R E C O R D
Book E-___ 91 ___ Page 541-42
Rec. Fee 6.50 , Tax _____
_____ Probate Judge

PLAINTIFF'S
EXHIBIT
K

MINUTES OF A SPECIAL MEETING OF THE BOARD OF DIRECTORS
OF THE BARBOUR COUNTY HISTORICAL PRESERVATION AUTHORITY
HELD ON OCTOBER _11_, 1985

A special meeting of the Board of Directors of the Barbour County Historical Preservation Authority, a public corporation, was held in Eufaula, Alabama on the _11th_ day of October, 1985, at _10_ o'clock _A_.M.

Charles L. Rogers served as Chairman of the meeting and Lynne M. MacElvain served as Secretary.

The Chairman stated that the first order of business was consideration of ratification and approval by the Board of Directors of an amendment to the Inducement Agreement between the Authority and Jack J. Rusch. After a thorough review of the progress being made on the project covered by the Inducement Agreement, upon motion duly made and seconded, the Board of Directors unanimously approved an amendment to the said Inducement Agreement changing the date in the second line of Section 12 from July 1, 1985 to October 1, 1986, said amendment to be effective as of July 1, 1985. The Board unanimously authorized and directed the appropriate officers of the Board to execute an amendment to the Inducement Agreement.

There being no further business to come before the meeting, it was moved and seconded that the meeting be adjourned. Motion carried.

Minutes approved:

_____
Chairman

Attest: _____
Secretary

16

The undersigned, being all of the Directors of the Barbour County Historical Preservation Authority, a public corporation, do hereby waive any and all notice of the time, place and purpose of a special meeting of the Board of Directors of said Authority for the purpose of amending the Inducement Agreement between the Authority and Jack J. Rusch, which meeting is called to be held in Eufaula, Alabama, on the 11 day of October, 1985, at 10 o'clock A. M. and do hereby ratify and approve the action taken at said meeting of which the foregoing is the minutes.

WITNESS our hands this 11 day of October, 1985.

_Louella Hobbs_
Louella Hobbs

_Lynne M. MacElvain_
Lynne M. MacElvain

_Charles L. Rogers_
Charles L. Rogers